# In the

# United States Court of Appeals

## For the Second Circuit

---

August Term, 2014

No. 13-1706-cr

UNITED STATES,

*Appellee*,

*v.*

NATHAN BROWN,

*Defendant-Appellant*.

---

Appeal from the United States District Court

for the Northern District of New York.

No. 12-cr-145 – Gary L. Sharpe, *Judge*.

---

SUBMITTED: FEBRUARY 17, 2015

DECIDED: DECEMBER 6, 2016

---

1

Before: POOLER, SACK, and DRONEY, *Circuit Judges*.

———————————

Appeal from a January 29, 2013 judgment of the United States District Court for the Northern District of New York (Sharpe, *J.*) sentencing Defendant-Appellant Nathan Brown to 60 years' imprisonment for producing and possessing child pornography. We **AFFIRM**.

Judge SACK concurs in the result in a separate opinion.

Judge POOLER dissents in a separate opinion.

———————————

> BRENDA K. SANNES AND RICHARD D. BELLISS, Assistant United States Attorneys, *for* Richard S. Hartunian, United States Attorney for the Northern District of New York, Syracuse, NY, *for Appellee.*
>
> S. MICHAEL MUSA-OBREGON, Maspeth, NY, *for Defendant-Appellant*.

———————————

DRONEY, *Circuit Judge*:

Nathan Brown pleaded guilty to three counts of production of child pornography in violation of 18 U.S.C. § 2251(a) and two counts of possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B). The district court (Sharpe, *J.*) imposed a sentence of 240 months for each of the three counts of production of child pornography (to be served consecutively) and 120 months for each of the two counts of possession of child pornography (to be served concurrently with the other sentences) for a total effective sentence of 60 years' imprisonment. Brown challenges his sentence, arguing the district court miscalculated his Guidelines range and that his sentence is substantively unreasonable.

We **AFFIRM** the judgment of the district court.

## BACKGROUND

Brown has never objected to the factual portions of his Pre-Sentence Report ("PSR") prepared by the United States Probation

Office. In addition, as part of his plea agreement, he expressly admitted certain details of his criminal conduct. The facts— undisputed by Brown—are the following.

In February 2012, the United States Department of Homeland Security Investigations ("HSI") discovered eleven images on a child pornography website that appeared to have been uploaded by the same person. Several of the images depicted the same girl, referred to here as "Jane Doe 1." It was later determined that Jane Doe 1 was eight years old at the time the images were taken. In one image, Jane Doe 1 was pictured with only a shirt on, with her vagina exposed, and with an open diaper next to each of her legs. In another, she was naked in a bathtub, again with her genitalia exposed. Additional pictures contained close-up images of her vagina, and one showed a male hand pulling aside her underwear. In several of the images, Jane Doe 1 was sleeping. Among these

4

photographs was a picture of her hand holding an adult penis and two images of semen on her hand.

The pictures on the website also included images of another young girl, who was ten or eleven years old at the time the images were taken, ("Jane Doe 2"). The photographs showed Jane Doe 2 with her underwear pulled to the side and her vagina exposed; with her breast exposed; with an adult penis next to her mouth; and with an adult penis on her lips. Like Jane Doe 1, the images also included close-up pictures of her vagina. Jane Doe 2 was also sleeping in several of the pictures.

By examining metadata[1] from one of the images, investigators were able to determine that the image had been taken using a

---

[1] Metadata is "[d]ata typically stored electronically that describes characteristics of [electronically stored information ('ESI')], . . . . [such as] how, when, and by whom ESI was collected, created, accessed, modified, and how it is formatted." The Sedona Conference, *The Sedona Conference Glossary: E–Discovery & Digital Information Management* 34 (Sherry B. Harris & Paul H. McVoy, eds., 3d ed. 2010). Here, the metadata associated with the image that the HSI found online consisted of the date, time, and GPS coordinates registered by the recording device at the time the image was captured and the type of recording device (*i.e.*, a Motorola Droid X cell phone) that was used.

Motorola Droid X cell phone. The metadata also revealed global positioning system ("GPS") coordinates associated with the image. With assistance from the cell phone carrier in that region for the Motorola Droid X, investigators were able to determine the approximate area where the photograph was taken. Investigators then spoke with the superintendent for schools within that area, who identified a sanitized image of Jane Doe 1.

The HSI agents visited Jane Doe 1's home and spoke with her parents. Through these interviews, the HSI learned that Jane Doe 1 and Jane Doe 2 were cousins. Investigators then spoke to Jane Doe 2's mother as well. The HSI learned that Brown—the former boyfriend of Jane Doe 2's mother—had frequently babysat both girls at Jane Doe 2's trailer home, where the photographs were taken.

Jane Doe 1 and Jane Doe 2 were interviewed. The girls reported that while babysitting Brown would "play house" with them, and Jane Doe 1 would play the "baby" and wear a diaper.

6

PSR ¶¶ 18, 20, 31-33. According to Jane Doe 1, Brown would periodically "change" the diaper as if it were soiled. PSR ¶ 33. Jane Doe 1 reported that, while doing so, Brown had touched her as he "clean[ed]" her vaginal area with a baby wipe. PSR ¶ 33. Brown also took pictures of the girls as this was occurring.

Both girls were able to recognize themselves in the photographs that they were shown by investigators, and they remembered a number of the pictures which had been taken while they were awake. Jane Doe 1 told investigators that Brown had offered to buy her an iPad if she allowed him to take more pictures of her, which she refused.

Based on the information provided by the girls and their parents, the HSI agents obtained a search warrant for Brown's residence and electronic devices. On March 9, 2012, law enforcement officers executed the warrant at Brown's trailer home, and found him attempting to delete child pornography from his

computer. Brown was arrested. Among the items seized from Brown's apartment were multiple computers, cell phones, storage devices, and a pinhole camera.

After his arrest, Brown told investigators that he had been viewing child pornography online daily using software that hid his IP address. He admitted to taking nude photographs of children with his phone, including approximately 100 photographs of Jane Doe 1 and Jane Doe 2 that he uploaded from his phone to his computer. Brown told investigators that he had taken the pictures of Jane Doe 1 because the "opportunity was there." PSR ¶ 26.

Brown told investigators that he had also taken sexually-explicit photographs and videos of a third victim ("Jane Doe 3"), who was nine years old at the time. Jane Doe 3 was his ex-wife's sister. Images and videos of Jane Doe 3 were also found on Brown's computers. One video showed Brown touching his penis to her hand and ejaculating on it. Another showed him ejaculating on her

feet, and a third showed him pulling down her underwear and spreading her vagina with his fingers. Brown admitted to pulling down Jane Doe 3's underwear and photographing her while she was sleeping during a family trip to Lake George in December 2011. Jane Doe 3 currently has no knowledge that the photographs were taken; she was asleep at the time.

After Brown's arrest, investigators conducted a forensic analysis of his computers and phones. The eleven images that originally prompted the investigation were found on Brown's computers. The search also revealed that Brown had produced pornographic images of at least *five* children—Jane Does 1, 2, and 3, and two additional unidentified victims. The unidentified victims were a young girl (age eight or nine) and an infant.[2] Investigators

---

[2] There was some confusion at sentencing as to the content of the images of the unidentified victims. At sentencing, the government provided that the nature of the images of Victims #4 and 5 "were different" as "they involved a hidden camera where the images may not be considered sexually explicit, but they captured two minors changing in and out of their clothing." App. 80-81. The government continued, stating "there were two additional victims, Jane Doe VI and VII" who were "also secretly filmed with a hidden camera changing in and

9

also discovered photographs that Brown had taken by hiding his pinhole camera (1) in the bathroom of a home where a pool party was being held and (2) in the bathroom of a public water park in Lake George. The pinhole camera had captured images of children changing their clothes.

Brown possessed an extraordinary quantity of other child pornography not involving these five victims. His computers collectively contained over 25,000 still images and 365 videos, including approximately 4 still images involving torture, 60 displaying bondage, 30 depicting bestiality, 1,873 involving sexual

out of their clothes." App. 81. The government appears to have made this statement in error as the PSR states that "images of Victim #4 depicted a female approximately eight to nine years old with black hair opening her vagina and wearing a cartoon t-shirt" and that images of Victim #5 "depict an unknown infant." PSR ¶ 37. The PSR goes on to provide that "[i]mages were *also* located of unknowing victims obtained by the defendant hiding a pinhole camera at various locations." PSR ¶ 38 (emphasis added). The PSR provides that four children were filmed by the pinhole camera: an identified minor female who was unaware she was a victim, Brown's son, and two unidentified children who were taped changing out of their swimwear. PSR ¶ 38. Victims #4 and 5 are not those children, identified by the government at sentencing as Victims #6 and 7, depicted in images and videos obtained by Brown of the pinhole cameras. Rather they are victims depicted similarly to Jane Does 1, 2, and 3.

intercourse, 160 involving objects, and 18 involving infants. In total, 294 victims were identified in these images.

On March 21, 2012, Brown was indicted in the Northern District of New York on five counts: three counts of production of child pornography in violation of 18 U.S.C. §§ 2251(a), (e) and 2256(8) (Counts One to Three), and two counts of possession of child pornography in violation of 18 U.S.C. §§ 2252A(a)(5)(B), (b)(2) and 2256(8)(A) (Counts Four and Five).[3] The three production counts were based on the separate conduct involving Jane Does 1, 2, and 3. Brown pled guilty to all counts of the indictment.

At sentencing, the district court accepted the PSR's Guidelines calculation. In determining Brown's Guideline range, the PSR grouped Counts 1, 4, and 5 pursuant to U.S.S.G. § 3D1.2. The base offense level for this group ("Group 1") was calculated under U.S.S.G. § 2G2.1(a) to be 32. This base offense level was then

---

[3] There were two counts for possession of child pornography because images were found on two computers. App. 11-13.

11

increased by a total of 14 levels because of five sentencing enhancements: (1) a four-level enhancement pursuant to U.S.S.G. § 2G2.1(b)(1)(A) because Jane Doe 1 was under twelve years old, (2) a two-level enhancement pursuant to U.S.S.G. § 2G2.1(b)(2)(A) because the offense conduct "involved the commission of a sexual act or sexual contact," (3) a four-level enhancement pursuant to U.S.S.G. § 2G2.2(b)(4) because "the offense involved material that portrays sadistic or masochistic conduct or other depictions of violence," (4) a two-level enhancement pursuant to U.S.S.G. § 2G2.1(b)(5) because Jane Doe 1 was in the "custody, care or supervisory control" of Brown, and (5) a two-level enhancement pursuant to U.S.S.G. § 3A1.1(b)(1) because Brown "knew or should have known" that the conduct involved a vulnerable victim. These enhancements amounted to an offense level of 46 for Group 1.

Counts 2 and 3 were placed in two separate groups because of the separate harm to Jane Does 2 and 3. The offense level calculated

for Groups 2 and 3 was 42. The offense level calculations for these groups were identical to the calculation in Group 1, except that no enhancements for depictions of sadistic or masochistic conducted were applied, as the possession counts were not included in Groups 2 and 3. To combine the groups, the PSR took the greatest offense level of the groupings—46 from Group 1—and increased that offense level by 3 pursuant to U.S.S.G. § 3D1.4. Brown's combined adjusted offense level on all counts was 49. Brown received a final five-level enhancement pursuant to U.S.S.G. § 4B1.5(b) for having "engaged in a pattern of activity involving prohibited sexual conduct." Finally, Brown received a three-level reduction for acceptance of responsibility. The total offense level was then "treated as level 43," the maximum offense level under the Guidelines. *See* U.S.S.G. ch. 5, pt. A, application note 2 ("An offense level of more than 43 is to be treated as an offense level of 43.").

At Criminal History Category I and offense level 43, Brown's recommended sentence under the Guidelines was initially life imprisonment. However, because each count was subject to a statutory maximum, Brown's recommended Guidelines sentence became 110 years.

Many of the victims identified in the images that related to the two possession counts provided Victim Impact Letters to the district court prior to sentencing. In those letters, the victims recounted feelings of helplessness, depression, shame, and fear. In the words of one victim,

> My privacy and myself ha[ve] been violated and my pictures are on the internet all over the world. . . . Even though I've tried so hard to forget there's not a day that goes by that it doesn't affect me. . . . I break down into tears all of a sudden, I don't talk for a day, I get random flashbacks, I have horrible nightmares. . . . Now the pictures are spread all over the internet, and unfortunately it's beyond my control.

PSR at 36-37. In the words of another victim, "[b]eing sexually abused is something you never forget, . . . . [b]ut when you have

14

photographs of your abuse on the Internet, . . . it makes it even more impossible to keep it in your past and move on from it. It is like the abuse is still happening." PSR at 41.

As to the three counts of the indictment which charged production of child pornography, the families of Jane Doe 1 and Jane Doe 2 spoke at Brown's sentencing. They described the significant behavioral issues that these girls suffer, and how the girls struggle to maintain relationships with family and friends. For example, Jane Doe 1's family explained that Jane Doe 1 blames herself for what happened. She experiences frequent nightmares in which Brown "chas[es] her with [his] phone and camera." App. 84. Jane Doe 1's grandmother recounted witnessing these nightmares and hearing Jane Doe 1 scream, "Get him off me, get him off me." App. 84. Jane Doe 1 was nearly held back in school and required one-on-one tutoring and counseling services. Jane Doe 2's family similarly described how Jane Doe 2 suffers from guilt and nightmares, has

15

difficulty trusting other people, and has required extensive treatment, including medication and counseling. The families told the district court that both they and the girls "feel violated in the worst imaginable way" and that the girls "live in fear" and continue to "struggle[] with what happened." App. 83. Jane Doe 3, Brown's ex-wife's sister, PSR ¶ 61, did not submit a Victim Impact Statement or speak at sentencing.

Brown did not object to the Guidelines calculations or to the factual matters set forth in the PSR, but asked for a non-Guidelines sentence of fifteen years' imprisonment. The district court sentenced Brown to 60 years' imprisonment, imposing 20-year consecutive terms on Counts One through Three (the production counts related to victims Jane Does 1 through 3), and 10-year terms on Counts Four and Five (the possession counts) to be served concurrently with one another and with its sentence on the production counts.[4]

---

[4] A supervised release term of life was also imposed, as well as a restitution award of $10,416.

16

**DISCUSSION**

"Our review of criminal sentences includes both procedural and substantive components and amounts to review for abuse of discretion." *United States v. McIntosh*, 753 F.3d 388, 393-94 (2d Cir. 2014) (per curiam) (internal quotation marks omitted). We "must first ensure that the district court committed no significant procedural error." *Gall v. United States*, 552 U.S. 38, 51 (2007). Procedural error occurs in situations where "the district court miscalculates the Guidelines; treats them as mandatory; does not adequately explain the sentence imposed; does not properly consider the § 3553(a) factors; bases its sentence on clearly erroneous facts; or deviates from the Guidelines without explanation." *McIntosh*, 753 F.3d at 394. "Once we have determined that the sentence is procedurally sound, we then review the substantive reasonableness of the sentence, reversing only when the trial court's sentence 'cannot be located within the range of permissible

17

decisions.'" *United States v. Dorvee,* 616 F.3d 174, 179 (2d Cir. 2010) (quoting *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008)).

A sentence is substantively unreasonable if, for instance, it would "damage the administration of justice because the sentence imposed was shockingly high." *United States v. Rigas*, 583 F.3d 108, 123 (2d Cir. 2009). Upon review for substantive unreasonableness, we "take into account the totality of the circumstances, giving due deference to the sentencing judge's exercise of discretion, and bearing in mind the institutional advantages of district courts." *Cavera*, 550 F.3d at 190.

I first address Brown's argument that the district court miscalculated his Guidelines range, and then turn to whether Brown's sentence was substantively reasonable.

**I. Procedural Reasonableness**

On appeal, Brown raises—for the first time—two challenges to his Guidelines calculation: (1) that the district court misapplied the

18

Guidelines' grouping and stacking provisions and (2) that the court erroneously applied an enhancement for material depicting sadistic or masochistic conduct.[5] The government argues that Brown has waived these objections to the district court's Guidelines calculations by failing to object to the PSR.

"[W]aiver is the "intentional relinquishment or abandonment of a known right." *United States v. Olano,* 507 U.S. 725, 733 (1993) (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464 (1938)). "[C]ourts applying [the] waiver doctrine have focused on strategic, deliberate

---

[5] The dissent suggests a third problem with Brown's Guidelines calculation—raised neither here nor below—that the conduct underlying certain sentencing enhancements "cannot justify such a dramatic departure from the sentence that would have been recommended based solely on the offense itself." Dissenting Op., *post* at 5. However, each of the three enhancements highlighted in the dissent arose from distinct harms inflicted by Brown's criminal conduct, specifically: (1) that the victims were in Brown's care at the time of the abuse, U.S.S.G. § 2G2.1(b)(5); (2) that the victims were asleep during some of the abuse and therefore especially vulnerable, U.S.S.G. § 3A1.1(b)(1); and (3) that the victims were of a particularly young age, U.S.S.G. § 2G2.1(b)(1). These enhancements increased Brown's Guidelines range, but the resulting increase is not error—even if it were properly before us—because each enhancement accounted for separate harms. *See United States v. Volpe*, 224 F.3d 72, 76 (2d Cir. 2000) ("[M]ultiple adjustments may properly be imposed when they aim at different harms emanating from the same conduct.").

19

decisions that litigants consciously make." *United States v. Dantzler,* 771 F.3d 137, 146 n.5 (2d Cir. 2014). A true waiver will "extinguish" an error in the district court, precluding appellate review. *Olano*, 507 U.S. at 733. By contrast, "[i]f a party's failure to [object] is simply a matter of oversight, then such oversight qualifies as a correctable 'forfeiture' . . . ." *United States v. Yu-Leung*, 51 F.3d 1116, 1122 (2d Cir. 1995). If a party forfeits an argument, we review for plain error. *Id.* Under the plain error standard, an appellant must demonstrate that "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Marcus*, 560 U.S. 258, 262 (2010) (internal alteration and quotation marks omitted).

There is some tension in our case law concerning the application of plain error review and waiver in the sentencing context. *Compare United States v. McCrimon*, 788 F.3d 75, 78 (2d Cir. 2015) ("The plain error doctrine should not be applied stringently in the sentencing context, where the cost of correcting an unpreserved error is not as great as in the trial context." (alteration and internal quotation marks omitted)), *United States v. Wernick*, 691 F.3d 108, 113 (2d Cir. 2012) (same), *with United States v. Jass*, 569 F.3d 47, 66 (2d Cir. 2009) (concluding that failure to object to sentencing enhancement constituted forfeiture), *and United States v. Eberhard*, 525 F.3d 175, 179 (2d Cir. 2008) (same). It is not necessary to decide whether Brown's challenges to the Guidelines calculation were waived or forfeited, or whether the plain error doctrine should be applied stringently, however, because, for the reasons discussed below, he fails to demonstrate any error whatsoever.

## A. Grouping and Stacking

Brown first argues that the district court erred in its application of the Guidelines' grouping and stacking provisions.

Chapter 3, Part D of the Sentencing Guidelines Manual provides rules for determining a single offense level when a defendant is convicted of multiple counts. *See generally United States v. Feola*, 275 F.3d 216, 219 (2d Cir. 2001). First, under the Guidelines, "[a]ll counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule . . . [w]hen counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan." U.S.S.G. § 3D1.2(b). Next, an offense level for each group is determined by using the offense level, enhanced by relevant conduct, for the most serious offense within the group. *Id.* § 3D1.3(a). The combined offense level is then determined by using

22

the offense level of the group with the highest offense level, adjusting that level upward based on the offense levels of the other groups, and finally decreasing the offense level as appropriate if the defendant accepts responsibility for his offenses. *Id.* §§ 3D1.4, 3E1.1.

The district court correctly applied these provisions. As noted, the district court combined Counts 1, 4, and 5 (Group 1). The court was required to group Counts 2 and 3 separately because Section 3D1.2(d) specifically prohibits counts charging production of child pornography to be grouped together. The court then determined a combined offense level by using the offense level for Group 1—the group with the highest level—increasing that offense level based on the levels of Groups 2 and 3, and decreasing the offense level based on Brown's acceptance of responsibility. There is no error, much less plain error, in how the district court grouped Brown's convictions counts.

Nor is there any error in the district court's application of the stacking provisions in Chapter 5 of the Guidelines Manual. Section 5G1.2(d) provides, "[i]f the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment." The district court correctly determined that the Guidelines range was 110 years based on the stacking maximums for the three production counts, which each carried a statutory maximum of 30 years, and the two possession counts, which each carried a statutory maximum of 10 years. The district court also appropriately applied Section 5G1.2 in arriving at the sentence imposed.

**B. Enhancement for Violent and Sadomasochistic Conduct**

Brown next argues that the district court erred by applying a four-level sentencing enhancement to Group 1 for an "offense

24

involv[ing] material that portrays sadistic or masochistic conduct or other depictions of violence," U.S.S.G. § 2G2.2(b)(4), despite the fact that Brown did not produce any sadistic images. Brown apparently contends that although the materials underlying the possession counts contained such images, that enhancement should not apply because the possession counts were not relevant conduct for the production counts.[6]

It is not necessary to address Brown's argument because any error would necessarily be harmless. Because Brown's total offense level exceeded the highest offense level listed in the sentencing table by more than four levels, Brown's Guidelines range would have been identical even absent this enhancement. Any misapplication was therefore harmless. *United States v. Cramer*, 777 F.3d 597, 603 (2d Cir. 2015) ("An error in Guidelines calculation is harmless if

---

[6] Brown also claims that the district court misunderstood that this type of material was only involved in the possession counts, not the production counts. The transcript of the sentencing reflects that the district court understood this distinction, however.

25

correcting the error would result in no change to the Guidelines offense level and sentencing range.").

## II.    Substantive Reasonableness

Brown argues his sentence of 720 months is unreasonable because it results in a *de facto* life sentence. He also argues the district court abused its discretion in concluding Brown lacked remorse.

This Court will "set aside a district court's substantive determination only in exceptional cases where the trial court's decision 'cannot be located within the range of permissible decisions.'" *Cavera*, 550 F.3d at 189 (quoting *Rigas*, 490 F.3d at 238). Brown has not shown that the district court's decision is such an exceptional case. Given the seriousness of the crimes involved here, a 60 year sentence—which was below the Guidelines range—is within the realm of punishments that this Court has upheld as reasonable for production of child pornography, even considering

26

that there may be, as Brown argues, "more serious" crimes such as intentional murder. *See, e.g., United States v. Hamilton*, 548 F. App'x 728, 730 (2d Cir. 2013) (summary order) ("Insofar as Hamilton argues that . . . [life] sentences should be 'reserved [for] intentional murder,' we find such an argument unavailing. Nor are we persuaded that a life sentence in the case at bar overstates the 'seriousness of the offense,' *see* 18 U.S.C. § 3553(a)(2)(A), given Hamilton's role in producing graphic child pornography by filming himself sexually abusing children as young as four years old.").

Additionally, the district court did not abuse its discretion in determining Brown had not demonstrated remorse. First, the district court, having adopted the Guidelines calculation in the PSR, accepted a three-level reduction in Brown's offense level for acceptance of responsibility. Second, the district court based its conclusion that Brown showed "no true serious remorse," App. 101,

27

on Brown's behavior at sentencing as well as his statements to the Probation Office contained in the PSR.

As to the substantive reasonableness of the sentence, this case is not, as Brown argues and the dissent maintains, *United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010). In *Dorvee*, the defendant was sentenced to the statutory maximum of 240 months' imprisonment after pleading guilty to one count of *distribution* of child pornography. *See id.* at 176. Dorvee's conviction arose from sexually-explicit conversations that he had online with two undercover police officers that he believed to be teenage boys. *Id.* Dorvee was arrested when he arrived at a meeting with one of the "boys," after indicating that he wanted to photograph and engage in sexual conduct with the "boy." *Id.* A search of Dorvee's computers revealed several thousand still images and approximately 100 to 125 videos of minors engaging in sexually explicit conduct. *Id.*

We found Dorvee's within-Guidelines sentence to be substantively unreasonable. *Id.* at 188. The district court had "apparent[ly] assum[ed] that Dorvee was likely to actually sexually assault a child," but this assumption was "unsupported by the record evidence," which demonstrated that Dorvee had never had any actual sexual contact with children. *Id.* at 183-84. The record also contained medical and psychiatric expert reports that Dorvee was unlikely to initiate a relationship with a child. *Id.* at 183. We found that application of the Guidelines in Dorvee's case led to an irrational result, observing that the Guidelines resulted in a greater sentence than had he been convicted of "actually engag[ing] in sexual conduct with a minor." *Id.* at 187.

Brown *did* have actual sexual contact—repeatedly—with multiple young victims, and Brown engaged in the *production* of child pornography during the course of this abuse. We have repeatedly upheld lengthy sentences in production cases post-

29

*Dorvee*, recognizing a distinction between production and possession, particularly in production cases involving sexual contact with victims. *See United States v. Oehne*, 698 F.3d 119, 125 (2d Cir. 2012) (per curiam) ("*Dorvee* is readily distinguishable . . . . Unlike the defendant in *Dorvee*, Oehne actually sexually assaulted a child. . . . He photographed the abuse and distributed the images over the internet, where they have been viewed by thousands worldwide."); *United States v. Broxmeyer*, 699 F.3d 265, 291 (2d Cir. 2012) ("[T]his case is distinguishable [from *Dorvee*] in presenting ample record evidence of Broxmeyer actively engaging minors in sexual conduct, for purposes of both photographing it and participating in it.").

Moreover, the fact that the victims were asleep when some of the photographs and videos were taken of them does not, as the dissent suggests, make Brown's conduct any less serious. *See* Dissenting Op., *post* at 5, 8, 10. Simply because they did not know of

30

Brown's actions when they were sleeping does not diminish the harm they suffered. As to Jane Doe 3, the fact that she was asleep for all of the sexual abuse does not mean that she will never learn of it, or that she will not suffer the emotional and psychological harm described by the other victims.[7]

Given the seriousness of Brown's offenses and the need to protect the public from further crimes of this defendant and others, as well as the application by the district court of the other sentencing factors set forth in 18 U.S.C. § 3553(a), the sentence imposed in this case was "within the range of permissible decisions." *Cavera*, 550 F.3d at 191.

---

[7] In fact, under the Guidelines, an offense is *more* serious when the victim is "unusually vulnerable due to . . . physical or mental condition" or "otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1 cmt. n.2. Other circuits have specifically upheld applying this enhancement in child pornography and sexual abuse cases where victims were vulnerable because they were asleep at the time of the abuse. *See United States v. Kapordelis*, 569 F.3d 1291, 1316 (11th Cir. 2009); *United States v. Newsom*, 402 F.3d 780, 785 (7th Cir. 2005); *United States v. Wetchie*, 207 F.3d 632, 633-36 (9th Cir. 2000); *see also United States v. Finley*, 726 F.3d 483, 495 (3d Cir. 2013) (noting that sleeping children are "considerably more vulnerable" in context of child pornography production offenses).

## CONCLUSION

For the foregoing reasons, Brown's 720 month sentence was procedurally and substantively reasonable. Accordingly, we **AFFIRM** the judgment of the district court.

13-1706-cr
*United States v. Brown*

SACK, *Circuit Judge*, concurring:

I respectfully concur in the result proffered by the opinion of Judge Droney:  I vote to affirm the judgment of the district court, concluding that the sentence imposed is procedurally and substantively reasonable.  I write separately, however, to reflect on an aspect of these proceedings that I find troubling.

I have read and heard observations by many trial judges over the course of many years about the challenges inherent in imposing sentences.  As articulated by my colleague Denny Chin:

> Sentencing is perhaps the most important responsibility of a trial judge, and surely the most difficult.  Emotion is one reason it is so difficult.  The competing considerations evoke strong sentiments— anger, indignation, shame, sorrow, grief, despondency, and hope.  The sentencing judge is not immune from these emotions.[1]

"[A]ppellate courts play an important but clearly secondary role in the process of determining an appropriate sentence[:]  We review the work of district courts[, but] under a 'deferential abuse-of-discretion standard.'"  *United States v. Cavera*,

---

[1]  Hon. Denny Chin, *Sentencing: A Role for Empathy*, 160 U. PA. L. REV. 1561, 1579 (2012) (footnote omitted).

550 F.3d 180, 189 (2d Cir. 2008) (*en banc*) (quoting *Gall v. United States*, 552 U.S. 38, 41 (2007)), *cert. denied*, 556 U.S. 1268 (2009).

In addressing this appeal, the members of the panel start on what I understand to be common ground: The defendant pled guilty to reprehensible crimes, recounted at length in several opinions rendered in this appeal, including Judge Droney's issued today. The offenses for which the defendant was sentenced after pleading guilty to them involved a deeply disturbing combination of child molestation and the making, watching, and circulation of obscene child pornography. The details of the charged conduct challenge the adequacy of English-language adjectives to characterize them.

Notwithstanding the horrific nature of the crimes of conviction, we are nonetheless required, of course, to ensure the legal propriety of the sentence imposed by the district court. As Judge Pooler recognizes in her dissent, the district court imposed the practical equivalent of a life sentence without the possibility of parole. *See post* at **[1, 12]**. The size of that sentence alone counsels our careful, searching review of it. But the extreme nature of the offenses compels, I think, particularly meticulous scrutiny.

This is not the first time that I have been troubled by our appellate review in the context of the sexual abuse and exploitation of children—including the uploading and downloading of child pornography.  In *United States v. Reingold*, 731 F.3d 204 (2d Cir. 2013), a panel of the Court on which I sat addressed a district court's sentence in a case involving generally similar criminal conduct.  In that case, after sharing videos and a still image with an undercover federal agent, the defendant pleaded guilty to one count of distributing child pornography and was sentenced below the statutorily mandated five-year minimum to a term of thirty months' imprisonment.  *Id.* at 207-10.  The majority opinion on review briefly described the pornography the defendant had distributed.  *Id.* at 216-17.  It also recounted in some detail prior sexual conduct with minors in which the relatively young defendant had engaged but for which he was not charged in the underlying indictment.  This included the defendant's molestation of his half-sister, *id.* at 207-08, 218, 225, and sexual activities with three underage friends, *id.* at 208 n.4.  We determined that the applicable statutory minimum did not amount to "cruel and unusual punishment" in violation of the Eighth Amendment, and that the district court therefore erred in arriving at a contrary

conclusion and imposing a lesser sentence. *Id.* at 206, 230. We then remanded for resentencing. *Id.* at 230.

I concurred in the opinion and judgment of the Court. I was concerned, though, that enumerating the details of the defendant's actions was in some respects unnecessary and unwarranted:

> [T]o borrow a phrase from death-penalty cases and twist it, child pornography is different.[2] Focusing on subjects that are associated with our most powerful taboos, these cases evoke uniquely strong, if differing, emotional, moral, and cultural reactions from judges, necessarily based on the differing beliefs, values, sensitivities, and life experiences of those judges. . . .
>
> [W]hen we go beyond what is necessary to resolve this sort of case, . . . we risk the appearance of explicitly or implicitly voicing our moral indignation rather than exercising our legal judgment, which is of course our only charge.

---

[2] While reporting on Yahoo's modification of a "system intended to scan emails for child pornography and spam," *New York Times* reporters recently observed that "[t]echnology companies like Yahoo, Google and Microsoft scan for child pornography and are required to report any discoveries to the National Center for Missing and Exploited Children." Charlie Savage & Nicole Perlroth, *Yahoo Said to Have Adapted Email Scanner to Aid U.S. Surveillance*, N.Y. TIMES, Oct. 6, 2016, at B1, B6. In this regard, it would appear that when compared with the subjects of most other crimes, child pornography is indeed different. And as I noted in my concurrence in *Reingold*, "'Violence against children strikes most people as a uniquely terrible phenomenon, which may be why filmmakers are so fond of it.'" 731 F.3d at 232 n.7 (Sack, J., concurring) (quoting A.O. Scott, *After Two Children Vanish, Agony Begets Recklessness*, N.Y. TIMES, Sept. 20, 2013, at C12).

*Id.* at 232-33 (Sack, J., concurring) (footnotes in original omitted).

I dare say that none of my colleagues would disagree with the proposition that our review of *all* sentences should be careful and objective—it is the lives and welfare of human beings with which we are dealing. But when we review a sentence in a case involving the production, distribution, or possession of child pornography, or some combination thereof—and even more so when the offense conduct includes child molestation—we are confronted with behavior that generates an especially strong, visceral revulsion in most, or perhaps all, of us. It is our certain, intense sympathy for the *victims* of such offenses, I think, that requires special care to guard our own objectivity and to ensure that the sentencing judge has done the same.

I do not mean to suggest that disgust is not relevant to the imposition and review of a sentence—it may well be. Its severity may, for example, reflect the depth of emotional harm, both present and future, that a defendant has inflicted upon a victim and his or her family and friends. The public's natural revulsion matters too, I think, insofar as its members suffer by empathizing with the victim, and in light of their more general legitimate interest in seeing that the offender receives just punishment.

It seems to me, however, that the emotions of a judge, standing alone—his or her personal outrage—should be as far removed from sentencing decisions as can practically be achieved. Those emotions, when unconnected to those of the victim, his or her loved ones, or the public, should not influence the severity of a sentence. Sentencing judges must apply the law to the facts (including the fact of how others have emotionally responded to the crime), not vindicate their own anger and agitation or appear to be doing so. Similarly, part of our job as reviewing judges is to avoid losing our own objectivity or focus because of our own disgust. Because of the reaction such a crime evokes in us and in the trial court, we must be particularly assiduous in assuring objectivity and propriety in assessing the sentence imposed.

In that light, I find this appeal to be a difficult one. As a panel of this Court recently pointed out (albeit in a non-precedential order), "We have in the past ordered cases reassigned when it appeared that a judge had made a 'visceral judgment' about a party that might make it difficult for the judge to assess the case dispassionately." *United States v. Mangone*, 652 F. App'x 15, 18 (2d Cir. 2016) (summary order) (quoting *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 142 (2d Cir. 2007)); *cf. United States v. Cossey*, 632 F.3d 82, 87-89 (2d Cir. 2011) (*per*

*curiam*) (reversing and remanding for resentencing before a different judge on plain error review of a sentence for possession of child pornography, in part because the district court's "unsupported belief that [the defendant] was prevented from controlling his behavior due to a genetic inability to do so" formed part of the court's analysis of the defendant's propensity to re-offend).

In this context, some of the statements made by the district court in the course of imposing sentence in the case before us give me pause.[3]  Here is how Judge Pooler put it in her since-withdrawn opinion for a majority of this panel, *United States v. Brown*, 826 F.3d 51 (2d Cir. 2016),[4] in which I had joined:

> The [district] court . . . discussed the seriousness of Brown's crimes, noting "the trauma to these three children [as] reflected in the presentence report [and] the statements of the relatives who have appeared on their behalf," which the court said "demonstrate[d] how drastic and dramatic the criminal conduct [was] here."  App'x at 100. With respect to the possession counts, the court stated that the children depicted in the photographs Brown possessed "were hijacked by people exactly like . . . Brown, put through [torture, sexual intercourse, bestiality, and bondage], [and] photographed," and that the children would worry "for the rest of their li[v]e[s]" that "those photographs are out there forever."  App'x at 100.  The court

---

[3] Judge Pooler identifies most of these statements in her dissent.  *See post* at **[7-9]**.

[4] Although that opinion, which remanded the case for resentencing, has been withdrawn to make way for today's, to the best of my knowledge, its description of the proceedings in the district court remains accurate.

7

also said that Brown's crimes were "as serious . . . as federal judges confront" and that Brown was "the worst kind of dangerous sex offender."  App'x at 101-02.  In discussing the need to protect the public from Brown, the court said to him, "[I]t may be true that you could not help yourself, but it's also true that y[ou] destroyed the lives of three specific children . . . ."  App'x at 101.

*Id.* at 56 (first ellipsis and brackets added; other brackets and ellipses in the original).

None of those statements was strictly true.  The record discloses no reason to conclude that the children depicted in the photographs taken by others that Brown possessed were "hijacked" by people "exactly like" him or that Brown subjected his victims to torture, sexual intercourse, bestiality, and bondage, and then photographed them.  Nor could the district court have actually believed that Brown's crimes were "as serious . . . as federal judges confront," as any judge who has dealt with deadly terrorists attacks can likely attest.  I am also skeptical that Brown qualifies as the "worst kind of dangerous sex offender" when compared with, say, a serial child rapist.  Finally, it is not necessarily accurate to say that Brown destroyed the lives of "three specific children" who will worry "for the rest of their lives" that the photographs will be available to persons seeking

them "forever." As Judge Pooler observes, one of the girls was asleep at the time of Brown's abuse and, as of sentencing, remained unaware that she was a victim of his crimes. *Post* at **[8]**. This child's lack of knowledge that Brown violated her in an atrocious manner does not mean that she is any less a victim of his crimes. Of course she is. But her life, hopefully, has not been "destroyed."

I find the district court's rhetorical excess disturbing. However, do this language and the accompanying sentence reflect "a 'visceral judgment' about a party that might make it difficult for the judge to assess the case dispassionately"? *Mangone*, 652 F. App'x at 18. It is, in my opinion, an uncomfortably close call. Therefore, heeding my own warning about the dangers inherent in this sort of appeal, and the need to be watchfully meticulous because of our probable visceral reaction to the case, I had thought it the wiser course to dot our "i"s and cross our "t"s. It was principally for that reason that, in joining in Judge Pooler's original opinion, I thought it was appropriate to remand for resentencing—to ensure that that the defendant's severe sentence was not based in any meaningful part on inappropriate emotional considerations.

I think my concerns were sound. I have now been convinced, however, that my conclusion that a remand was therefore required was not. For the reasons spelled out by Judge Droney in today's opinion, I agree that the sentence—although strikingly lengthy, as Judge Pooler points out—was, as a legal matter, both procedurally and substantively reasonable. I am sufficiently assured that the district judge's overstatements at the time of sentencing were rhetorical overkill (which, incidentally, is not terribly unusual in the run of transcripts of sentencing proceedings that we review from time to time). And I have no reason to think that Brown's sentence must or would be reduced on remand. Nor do I think that encouraging a conclusion to this appeal through our rarely employed en banc procedures, if it were to come to that, would be helpful to Brown or to the Court.[5]

Therefore, mindful of Judge Chin's reflection that "[s]entencing is perhaps the most important responsibility of a trial judge, and surely the most difficult,"[6] and in light of our "clearly secondary role in the process of determining an

---

[5] Brown is, of course, presumably able to petition the Court to review this appeal en banc himself if he so chooses.

[6] Chin, *supra* note 1.

appropriate sentence," *Cavera*, 550 F.3d at 189, I join Judge Droney in deferring to the discretion of the district court.

I join in the judgment this Court affirming the judgment of the district court.

POOLER, *Circuit Judge*, dissenting:

The district court's 60-year sentence all but ensures that Nathan Brown, a first-time offender who was 32 when arrested, will die in prison. Brown could have murdered his victims, and he would not have received a harsher sentence.

What is more, Brown suffers this fate only because he was unlucky enough to be sentenced under federal law. Under New York state law, by contrast, the crime of "promoting an obscene sexual performance by a child" is punishable by up to seven years' imprisonment. *See* N.Y. Penal Law § 263.10 (providing that the crime is a class D felony), *id.* § 70(2)(d) (providing that the maximum term of imprisonment for class D felonies "shall not exceed seven years"). If Brown had been charged with three counts of that crime, he would have received, at most, 21 years' imprisonment.

The district court nonetheless concluded that the sentence was "necessary." The majority ratifies it as "reasonable." I cannot agree. Therefore, I respectfully dissent.

Any discussion of the reasonableness of Brown's sentence must begin with the sentencing guidelines that produced it. *See generally United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010); *United States v. Tutty*, 612 F.3d 128 (2d Cir. 2010). In

1

*Dorvee*, we explained that the child-pornography guidelines are "fundamentally different from most[,] and . . . unless applied with great care, can lead to unreasonable sentences." *Dorvee*, 616 F.3d at 184. This is because, although the guidelines are "typically developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices," the Commission "did not use this empirical approach in formulating the [g]uidelines for child pornography." *Id.* "Instead, at the direction of Congress, the Sentencing Commission has amended the [g]uidelines under [Section] 2G2.2 several times since their introduction in 1987, each time recommending harsher penalties." *Id.*

The current enhancements "routinely result in [g]uidelines projections near or exceeding the statutory maximum, even in run-of-the-mill cases." *Id.* at 186. For example, a first-time offender guilty of possessing child pornography is "likely to qualify for a sentence . . . rapidly approaching the statutory maximum, based solely on sentencing enhancements that are all but inherent to the crime of conviction." *Id.*

In *Dorvee*, these enhancements resulted in a guidelines range of 20 years' imprisonment for distribution of child pornography. *Id.* at 181. We held that,

2

notwithstanding that the district court's 20-year sentence was within the guidelines, the sentence was substantively unreasonable. *Id.* at 182-88.

Although Dorvee did not produce child pornography, much of the *Dorvee* court's criticism of the child pornography guidelines applies to the guidelines for production offenses as well. As with the guidelines for trafficking in child pornography found in Section 2G2.2, the Sentencing Commission did not use an empirical approach to develop the production guidelines found in Section 2G2.1. Instead, the Commission has increased the base offense level and added enhancements for production offenses "usually as a result of congressional directives." *See* U.S. Sentencing Comm'n, *Federal Child Pornography Offenses* 249 (2012) (hereinafter "2012 Commission Report"), http://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf.

Though the enhancements for production offenses are not applied as commonly as the enhancements for possession and distribution, they are very frequently applied,[1] and they quickly add up to recommended sentences at or

---

[1] In 2015, 47.1% of sentences under Section 2G2.1 involved a victim under the age of 12, 58.1% involved the commission of a sexual act or sexual contact, and 44.5%

3

above the 30-year statutory maximum.[2] Brown's case illustrates the point. The base offense level for one of Brown's production offenses was 32, corresponding to a guidelines range of about 10 to 13 years for a first-time offender such as Brown.[3] When Brown's three production counts are then "stacked" together under the guidelines, his base offense level for all three counts becomes 35, *see* U.S.S.G. § 3D1.4, corresponding to a guidelines range of about 14 to 18 years.[4]

---

involved a victim in the custody, care, or control of the defendant. *See* U. S. Sentencing Comm'n, *Use of Guidelines and Specific Offense Characteristics: Guideline Calculation Based, Fiscal Year 2015* 44 (2015), http://www.ussc.gov/sites/default/files/ pdf/research-and-publications/federal-sentencing-statistics/guideline- application-frequencies/2015/Use_of_SOC_Guideline_Based.pdf.

[2] Because of these enhancements, defendants convicted of child pornography offenses in federal court often receive sentences far exceeding the maximum punishments allowed by state law. *See generally* 2012 Commission Report at App'x F (listing penalties for possession, receipt, distribution, and production of child pornography under state statutes). As noted, New York punishes the crime of promoting an obscene sexual performance by a child with up to seven years' imprisonment. *See id.* at F-15; *see also* N.Y. Penal Law §§ 263.10, 70(2)(d). According to the Sentencing Commission, the range in New Jersey is 5-10 years; in California, 3-8. *See* 2012 Commission Report at F-2, F-14.

[3] The base offense level of 32 was itself imposed by Congress; the original base offense level was 25, corresponding to a guidelines range of about 5 to 6 years for a first-time offender. *See* 2012 Commission Report at 249.

[4] Brown was also charged with two counts of possessing child pornography. Those counts did not affect Brown's guidelines range because they "involve substantially the same harm" within the meaning of Section 3D1.2 of the guidelines and are therefore "grouped" with one of Brown's production counts.

Brown's offense level then increased, however, by virtue of six separate sentencing enhancements. Taken together, these enhancements catapulted Brown's guidelines range to the statutory maximum on all counts—110 years in total.

The conduct giving rise to these enhancements cannot justify such a dramatic departure from the sentence that would have been recommended based solely on the offense itself. For example, Brown received a two-level enhancement because Jane Doe 1 was in his "custody, care, or supervisory control." *See* U.S.S.G. § 2G2.1(b)(5). He received another two-level enhancement because the offense involved a "vulnerable victim," as Jane Doe 1 was sleeping in some of the pictures. *See* U.S.S.G. 3A1.1(b)(1). These two enhancements alone increased Brown's offense level to 39 and his guidelines range to 22-27 years. Thus, according to the guidelines, the fact that Brown was babysitting Jane Doe 1, and took pictures while she was sleeping, warrants an additional eight to nine years of imprisonment. Had Brown taken pictures of a stranger while she was awake, however, no additional punishment would have been imposed. It is doubtful that these distinctions can justify nearly a decade of additional

The base offense level of the "group" is the highest offense level of the counts in the group—here, the production count. *See* U.S.S.G. § 3D1.3.

5

imprisonment. Brown also received a four-level enhancement because Jane Doe 1 was under the age of twelve. *See* U.S.S.G. § 2G2.1(b)(1). To be sure, Jane Doe 1's age was relevant to the seriousness of the offense and ought to be considered in fashioning an appropriate sentence. But the four-level enhancement, when considered with the two enhancements just discussed, increased Brown's offense level to 43 and thus his guidelines range to the statutory maximum of 110 years.[5]

Particularly because of the abnormalities of the Sentencing Guidelines covering child pornography crimes, we must be especially careful in reviewing the substantive reasonableness of sentences assigned for these offenses. A key duty in that endeavor is to "consider whether [the] factor[s] relied on by a

---

[5] The majority believes that these enhancements are justifiable because they reflect "distinct harms," and cites the opinion in *United States v. Volpe*, 224 F.3d 72, 76 (2d Cir. 2000), to support that proposition. Majority Op. at 19 n.5. In *Volpe*, we ruled that a police officer who sexually abused a victim inflicted additional, separate harms by doing so "under color of law," and while the victim was in his "custody, care, or supervisory control." 224 F.3d at 76 (internal quotation marks and citations omitted). The difference between *Volpe* and this case is that *Volpe* did not involve a statute that criminalized only conduct between adults and children. *Id.* at 74. Where, as here, the statute applies *only* to conduct taken by an adult against a child, several enhancements purport to punish as "distinct harms" conduct that is all but inherent in the situations and relationships necessary to give rise to the crime. For example, it is difficult to think of a child victim who is not "vulnerable." The fact that children are vulnerable to adults' sexual abuse is very likely the reason that this crime carries such high guidelines recommendations even without enhancements. The enhancement for a "vulnerable victim" thus does not, in my view, punish any distinct harm.

6

sentencing court can bear the weight assigned to [them]." *United States v. Cavera*, 550 F.3d 180, 191 (2d Cir. 2008); *see also United States v. Rigas*, 583 F.3d 108, 122 (2d Cir. 2009). I am particularly concerned that the district court in this case misunderstood the effects of Brown's actions, and thus relied too heavily on the perceived harm to victims and the public in sentencing Brown.

To begin, the district court sentenced Brown to the same number of years for the harm he inflicted upon each of the three victims, even though the record showed serious differences among them. In the proceedings below, the district court stated:

> [T]he *three children* here [will] worry . . . for the rest of their life, [that] those photographs are out there forever . . . . [You] destroyed the lives of *three specific children* . . . . You are the worst kind of dangerous sex offender. You're not just one who looks at photographs obtained over the internet. . . . And for those reasons, there is a serious penalty to pay. . . .

> When I look at the first three counts and look at the specific children that are involved, then I have to say to myself[,] which one of 'em didn't you abuse? And my answer to that is there isn't none of the three that you didn't abuse.

> So when I look at the mandatory minimum on each of those children, I'm not willin' to walk away from *any of the three*. And as to those three counts, it is my sentence and I hereby sentence you to 20 years on each of those three counts to be served consecutively for a total of 60 years.

App'x at 100-02 (emphases added). The district court emphasized, repeatedly, that Brown "destroyed the lives of *three* specific children," who the district court said would "worry . . . for the rest of their li[v]e[s]" that their "photographs are out there forever." App'x at 100-01 (emphasis added). Although Brown abused three children, his third victim was "asleep the entire time during the production of the images and videos" and has "no knowledge of having been victimized by Brown." PSR ¶ 35. There is no evidence that Brown uploaded images or videos of the third victim. Her mother refused to submit a victim impact statement because her daughter "was unaware of the abuse" and suffered "no negative impact." PSR ¶ 51. That does not mean that Brown's abuse of this victim should be ignored, that it could not support some part of his sentence, or that the third victim was unharmed. It does mean, however, that the district court erred in giving Brown the *same sentence* for his conduct with respect to the third victim as for his conduct with respect to the other two victims, even though the other two had suffered severe psychological damage, and thus had been harmed far more seriously.

The majority is unconcerned that the district court based a third of Brown's 60-year sentence on his having "destroyed the li[fe]" of a victim, despite an

8

undisputed lack of evidence that the victim's life had been affected at all. Seeking to brush away the district court's major oversight, the majority suggests that the third victim will perhaps *later* learn of the abuse, and may, *at that time*, be damaged as severely as the others. Majority Op. at 31. That is nothing but speculation. Defendants have a constitutional right to be sentenced based on "accurate information" rather than guesses, *see, e.g.*, *United States v. Juwa*, 508 F.3d 694, 700 (2d Cir. 2007), a right that was surely violated in this case if the district court actually relied on the majority's proposed rationale.

The district court also demonstrated its overreliance on Brown's damage to the victims and society by declaring that he is "the worst kind of dangerous sex offender," App'x at 102, and that he is "exactly like" sex offenders who rape and torture children in order to produce child pornography. App'x at 100. Although Brown's offenses are serious, he clearly does not fit either of those descriptions. In discussing a thirty-year sentence for a child pornography charge in a recent case, one of our colleagues correctly observed the following regarding the "worst offenders" charged with this type of crime:

> They are people who force small children to engage in sexual and sadomasochistic acts, who photograph or video the scene, and who broadcast it to the world, leaving the children with the pain of the

9

experience and the anguish of knowing that degenerates are gloating over their abuse and humiliation.

*United States v. Broxmeyer*, 699 F.3d 265, 303 (2d Cir. 2012) (Jacobs, *J.*, dissenting).

Brown did not forcibly rape his victims or subject them to physical harm. He took pictures of the genitalia of three girls, usually while they were sleeping, by moving their underwear to the side. His offense did not involve penetration, extreme violence, abduction, or trafficking.

The majority likewise spends substantial time describing, in great detail, Brown's offense and its harm to the victims. Majority Op. at 4-7, 9-11, 15-17. The majority seems not to appreciate, however, that we are confronted here with actions far less depraved than those in many cases where defendants receive sentences decades shorter than Brown's. *See, e.g., United States v. Gilmore*, 599 F.3d 160, 162 (2d Cir. 2010) (30-year sentence for defendant who repeatedly raped his eight-year old daughter for two years); *United States v. Swackhammer*, 400 F. App'x 615, 616 (2d Cir. 2010) (summary order) (168-month sentence for defendant who repeatedly molested his children); *see also United States v. Irey*, 612 F.3d 1160 (11th Cir. 2010) (en banc) (determining that 30-year sentence should be imposed on one-count indictment where defendant "raped, sodomized, and sexually tortured fifty or more little girls, some as young as four years of age, on

10

many occasions over a four- or five-year period," and "scripted, cast, starred in, produced, and distributed worldwide some of the most graphic and disturbing child pornography that has ever turned up on the internet"); *United States v. Castro-Valenzuela*, 304 F. App'x 986, 988 (3d Cir. 2008) (summary order) (220-month sentence for defendant who videotaped himself violently sexually assaulting his girlfriend's seven-year-old niece). Moreover, Brown's 60-year sentence was exorbitant compared to those issued to typical federal defendants convicted of production offenses. In 2010—the most recent year for which data is available—the average sentence for production of child pornography was 267.1 months, or approximately 22 years. *See* 2012 Commission Report at 253. There is no reason to think that Brown's conduct was substantially worse than that of a typical defendant convicted under this statute.

Punishing Brown as harshly as a murderer also frustrates the goal of marginal deterrence, "that is, that the harshest sentences should be reserved for the most culpable behavior." *United States v. Newsom*, 402 F.3d 780, 785-786 (7th Cir. 2005). And "[t]hose who think that the idea of marginal deterrence should play some part in criminal sentences . . . might find little room left above [Brown's] sentence for the child abuser who physically harms his victims, who

11

abuses many different children, or who in other ways inflicts greater harm on his victims and society." *Id.* at 785-86.

Most importantly, in my view, is the clear injustice inherent in a *de facto* life sentence for Brown. As the Supreme Court has recognized,

> There is a line between homicide and other serious violent offenses against the individual. Serious nonhomicide crimes may be devastating in their harm[,] but in terms of moral depravity and of the injury to the person and to the public, they cannot be compared to murder in their severity and irrevocability. This is because life is over for the victim of the murderer, but for the victim of even a very serious nonhomicide crime, life is not over and normally is not beyond repair. Although an offense like robbery or rape is a serious crime deserving serious punishment, those crimes differ from homicide crimes in a moral sense.

*Graham v. Florida*, 560 U.S. 48, 69 (2010) (citations, alterations, and internal quotation marks omitted). Although Brown's crimes "differ from homicide crimes in a moral sense," he received the same sentence as a murderer. He received a sentence that "deprives [him] of the most basic liberties without giving hope for restoration." *Id.* at 69-70. It is a sentence that "means denial of hope," that "good behavior and character improvement are immaterial," that "whatever the future might hold in store for the mind and spirit . . . , [he] will remain in prison for the rest of his days." *Id.* at 70 (alterations and internal quotation marks omitted).

Much has been written in recent years about the problem of mass incarceration. But commuting the sentences of nonviolent drug offenders will only go so far. If we are truly to confront the problem, we must take a hard look at how we punish defendants like Nathan Brown. The role of federal appellate judges in this endeavor is, to be sure, circumscribed. Still, we have a responsibility not to stand idly by in cases when it would be "manifestly unjust to let [the] sentence stand." *Dorvee*, 616 F.3d at 188. In my view, this is one of those cases. I respectfully dissent.